**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| UNITED STATES *ex rel.* DAVID KOHLENBERGER, ) | |
| ) | |
| Plaintiff, ) | Civil Action No. |
| ) | |
| v. ) | FILED UNDER SEAL PURSUANT |
| ) | TO 31 U.S.C. § 3730(b)(2) |
| YOGIBO LLC, ) | |
| ) | |
| Defendant. ) | |

**FALSE CLAIMS ACT COMPLAINT**

David Kohlenberger ("Relator") brings this action as a *qui tam* relator on behalf of the United States against Yogibo LLC ("Yogibo") pursuant to the *qui tam* provisions of the False Claims Act, 31 U.S.C. § 3729-33, to recover damages, penalties, attorneys' fees and costs, and other relief.

**I.    PRELIMINARY STATEMENT**

1.    Yogibo is a New Hampshire furniture company that has evaded tariffs on merchandise it imported from China.

2.    Yogibo's tariff evasion scheme is simple. For each container of merchandise Yogibo imports from China, the Chinese vendor provides Yogibo with two commercial invoices, one with a real price and another with a false lower price. Yogibo gives the commercial invoice with the false lower price to its customs broker, Radius International, Inc. ("Radius"), which is based in Chelsea, Massachusetts. Radius then provides that commercial invoice to United States Customs and Border Protection ("CBP") and, on Yogibo's behalf, pays import duties based on the false lower price, thus fraudulently reducing Yogibo's duty obligations

SEALED

3.      Prior to the filing of this Complaint, Relator made substantive disclosures to the government of facts and evidence underlying the allegations in this Complaint, in accordance with the requirements of the False Claims Act, 31 U.S.C. § 3730(b)(2).

4.      Relator is an original source of the information underlying this Complaint and of the information provided to the United States prior to the filing of this Complaint. *See* 31 U.S.C. § 3730(e)(4)(B). To the Relator's knowledge, the information underlying the allegations and transactions in this Complaint has not been publicly disclosed.

5.      This action is filed *in camera* and under seal pursuant to the requirements of the False Claims Act, 31 U.S.C. § 3730(b)(2).

## II.     JURISDICTION AND VENUE

6.      This Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1345 and 31 U.S.C. § 3732, which confers jurisdiction over actions brought pursuant to 31 U.S.C. §§ 3729 and 3730.

7.      This Court may exercise personal jurisdiction over Yogibo, and venue is appropriate in this Court, under 31 U.S.C. § 3732(a) and 28 U.S.C. § 1391(b)(2), because Yogibo transacts business in this District and engaged in acts proscribed by 31 U.S.C. § 3729 in this District.

## III.    THE PARTIES

8.      Relator, a resident of Amherst, New Hampshire, served as Senior Logistics/Warehouse Manager for Yogibo from July 17, 2017, to November 4, 2021. In that capacity, Relator was responsible for, among other things, managing Yogibo's two warehouses, which are located in Nashua, New Hampshire, and Brookfield, Connecticut. Relator shared an office with his direct report, Kevin Reinbold, Yogibo's Logistics Manager in Nashua.

2

9.     Yogibo is a New Hampshire corporation with a principal place of business in Nashua, New Hampshire. Eyal Levy founded Yogibo in 2009 and continues to serve as its manager and chief executive. Through the internet and its own retail stores, Yogibo sells bean bag furniture and related items. It imports many of the components for its products from Yiwu Leadershow Home Textile Co., Ltd. ("Leadershow"), a company in Yiwu City, Zhejiang Province, China.

## IV.    REGULATORY BACKGROUND

### A.    Documentation Requirements for Importation of Goods into the United States

10.    CBP regulations provide that "the entry documentation required to secure the release of merchandise" arriving at a United States port must include, among other things, "[a] commercial invoice" and a "packing list." 19 C.F.R. § 142.3; *see also* 19 C.F.R. § 141.81 ("A commercial invoice shall be presented for each shipment of merchandise at the time the entry summary is filed. . . ."). The regulations further specify that a commercial invoice must set forth "[t]he purchase price of each item in the currency of the purchase." 19 C.F.R. § 141.86(a)(5); *see also* 19 C.F.R. § 141.83(c) (specifying that "[t]he commercial invoice shall be prepared in the manner customary in the trade [and] contain the information required by §§ 141.86 through 141.89").

### B.    Rules on Inclusion of Testing and Certification Costs in Calculation of Dutiable Amount

11.    Section 402 of the Tariff Act of 1930, 19 U.S.C. § 1401a, directs that the dutiable amount of merchandise imported into the United States shall be calculated, where possible, on the "price actually paid or payable for the merchandise when sold for exportation to the United States, plus . . . the value . . . of any assist." 19 U.S.C. § 1401a(b)(1)(C). The statute further

3

explains that the term "assist" includes "[e]ngineering, development, artwork, design work, and plans and sketches that are undertaken elsewhere than in the United States and are necessary for the production of the imported merchandise." 19 U.S.C. § 1401a(h)(1)(A)(iv).

### C.    Duties on Products from China

12.    Prior to 2018, products imported from China and other countries were subject to various tariffs depending on their eight-digit Harmonized Tariff Schedule ("HTS") code in the Harmonized Tariff Schedule of the United States.

13.    Beginning in 2018, pursuant to Section 301 of the Trade Act of 1974, 19 U.S.C. § 2411, the Office of the United States Trade Representative ("USTR") imposed additional duties on four "lists" of products from China. Each list identifies products by their HTS code.

14.    List 1. On June 20, 2018, USTR announced that, effective July 6, 2018, an additional 25 percent duty would apply to products from China on so-called "List 1." *See* USTR, *Notice of Action and Request for Public Comments Concerning Proposed Determination of Action Pursuant to Section 301: China's Acts, Policies, and Practices Related to Technology Transfer, Intellectual Property, and Innovation*, 83 Fed. Reg. 28,710, 28,711 (June 20, 2018).

15.    List 2. On August 16, 2018, USTR announced that, effective August 23, 2018, an additional 25 percent duty would apply to products from China on so-called "List 2." *See* USTR, *Notice of Action Pursuant to Section 301: China's Acts, Policies, and Practices Related to Technology Transfer, Intellectual Property, and Innovation*, 83 Fed. Reg. 40,823, 40,824 (Aug. 16, 2018).

16.    List 3. On September 21, 2018, USTR announced a two-phase implementation of duties on products from China on so-called "List 3." *See* USTR, *Notice of Modification of Section 301 Action: China's Acts, Policies, and Practices Related to Technology Transfer,*

*Intellectual Property, and Innovation*, 83 Fed. Reg. 47974 (Sept. 21, 2018). Under the initial

phase, beginning on September 24, 2018, the duty on List 3 products was 10 percent. *See id.* at

47975. Under the second phase, beginning on May 10, 2019, the duty on List 3 products

increased to 25 percent. *See* USTR, *Notice of Modification of Section 301 Action: China's Acts,*

*Policies, and Practices Related to Technology Transfer, Intellectual Property, and Innovation*,

84 Fed. Reg. 20459 (May 9, 2019). In a notice on May 31, 2019, USTR clarified that "[c]overed

products that were exported from China to the United States prior to May 10, 2019 will remain

subject to an additional 10 percent tariff if they enter into the U.S. before June 15, 2019." USTR,

*Notice Regarding Application of Section 301 Action* (May 31, 2019).

      17.    <u>List 4A</u>. On August 30, 2019, USTR announced that, effective September 1,

2019, an additional 15 percent duty would apply to products on Annex A of List 4. *See* USTR,

Notice of Modification of Section 301 Action: China's Acts, Policies, and Practices Related to

Technology Transfer, Intellectual Property, and Innovation, 84 Fed. Reg. 45821 (Aug. 30, 2019).

On January 22, 2020, USTR announced that, effective February 14, 2020, the duty on List 4A

products would decrease to 7.5 percent. *See* USTR, *Notice of Modification of Section 301*

*Action: China's Acts, Policies, and Practices Related to Technology Transfer, Intellectual*

*Property, and Innovation*, 85 Fed. Reg. 3741 (Jan. 22, 2020).

      **D.**    **The False Claims Act**

      18.    The False Claims Act provides, in pertinent part, that any person who:

(G) knowingly makes, uses, or causes to be made or used, a false record or
statement material to an obligation to pay or transmit money or property to the
Government, or knowingly conceals or knowingly and improperly avoids or
decreases an obligation to pay or transmit money or property to the Government;

is liable to the United States Government for a civil penalty of not less than
$5,000 and not more than $10,000, as adjusted by the Federal Civil Penalties
Inflation Adjustment Act of 1990 (28 U.S.C. 2461 note; Public Law 104-410),

plus 3 times the amount of damages which the Government sustains because of the act of that person.

31 U.S.C. § 3729(a)(1).

19.     For purposes of the False Claims Act, "the terms 'knowing' and 'knowingly' mean that a person, with respect to information[,] (i) has actual knowledge of the information; (ii) acts in deliberate ignorance of the truth or falsity of the information; or (iii) acts in reckless disregard of the truth or falsity of the information." 31 U.S.C. § 3729(b)(1)(A). No proof of specific intent to defraud is required. 31 U.S.C. § 3729(b)(1)(B).

## V.     FACTUAL ALLEGATIONS

20.     Yogibo typically imported approximately 40 containers of goods from Leadershow each year. Until 2021, the containers typically arrived at the Port of Boston, Massachusetts. In 2021, because of construction in and around the Port of Boston, some of the containers arrived in the Port of New York.

21.     Regardless of the port of entry, Yogibo relied on its customs broker, Radius, to pay the appropriate customs duties and to secure the release of the containers for shipment by truck to one of Yogibo's two warehouses.

22.     Before each container arrived in the United States, Relator and others at Yogibo received an e-mail from Leadershow with three attachments: (1) a packing list describing the contents of the container, (2) a commercial invoice with the price of the goods in the container, and (3) a "FOB and QC Charge Invoice" ("QC Invoice"). On the QC Invoice, the "Item description" typically stated "FOB, Project management and QC costs."

23.     Invariably, the amount of the charge on the QC Invoice was 15 percent of the sum of the amounts on the commercial invoice and the QC Invoice.

6

24.     Once Relator received a packing list and commercial invoice for a container from Leadershow, Relator forwarded those two documents to Radius.

25.     After the container arrived in port, Radius provided CBP with the packing list and commercial invoice Relator had sent, paid the associated duty on Yogibo's behalf, and secured release of the container for shipment to Yogibo.

26.     Early in Relator's tenure at Yogibo, after receiving an e-mail from Leadershow with a packing list, commercial invoice, and QC Invoice for an arriving container, Relator provided Radius with the QC Invoice, as well as the packing list and commercial invoice. When Yogibo's chief executive, Mr. Levy, saw what Relator had done, he reprimanded Relator and instructed Relator never again to send a QC Invoice to Radius.

27.     About 18 months after Relator started at Yogibo, Mike Lawrence, who served as Yogibo's controller until February 2020 and was responsible for accounts payable, walked into the office Relator shared with Mr. Reinbold and asked them for a copy of the commercial invoice for a container that had recently arrived from Leadershow. Mr. Reinbold provided Mr. Lawrence with a copy of the commercial invoice Relator and Mr. Reinbold had received from Leadershow, but Mr. Lawrence said that it was not the right commercial invoice and that he was looking for a different commercial invoice for the same container.

28.     Mr. Lawrence's statements indicated that Leadershow was providing Yogibo with two different commercial invoices for each container and that Yogibo was paying Leadershow more than the amounts shown on the invoices Yogibo was providing to CPB.

29.     On Mr. Lawrence's last day at Yogibo, he spent about an hour talking with Relator and Mr. Reinbold in the office that they shared. During this conversation, Mr. Lawrence, who is a Certified Public Accountant, expressed concerns about Yogibo's tax reporting practices.

He also confirmed that Yogibo had two sets of invoices for the products it imported from China, and that Yogibo paid the "real" invoices, which Relator and Mr. Reinbold never saw.

30. In mid-2021, Yogibo's new financial controller, Caitlin Maki, walked into the office Relator shared with Mr. Reinbold and asked them for a copy of the commercial invoice for a container that had recently arrived from Leadershow. As happened before when Mr. Lawrence made the same request, Mr. Reinbold provided Ms. Maki with a copy of the commercial invoice he had received, but she said that it was not the right invoice.

31. Thus, beginning at least as early as July 2017 and continuing through at least November 2021, for each shipment Yogibo received from Leadershow, Yogibo (via Radius) supplied CBP with one commercial invoice and then paid Leadershow based on a separate commercial invoice that showed a higher amount due. Further, to the extent Leadershow performed quality control on the goods it shipped to Yogibo, that work qualified as an assist pursuant to 19 U.S.C. § 1401a(b)(1)(C) and Yogibo should have paid duty on the amounts in the QC Invoices. In this manner, Yogibo consistently underpaid duties on products it imported from China.

## VI.   CAUSE OF ACTION

**COUNT I**
**Federal False Claims Act, 31 U.S.C. § 3729(a)(1)(G)**

32. Relator re-alleges and incorporates by reference all paragraphs of this complaint set out above as if fully set forth herein.

33. Yogibo knowingly made, used, or caused to be made or used false records and/or statements to conceal, avoid, or decrease obligations to pay or transmit money, in the form of customs duties, to the United States. Specifically, Yogibo knowingly made or used fake invoices

that fraudulently underrepresented the prices of merchandise it imported into the United States from China, and Yogibo accordingly underpaid customs duties on that merchandise.

34.     By virtue of the false or fraudulent records and/or statements Yogibo made or used, the United States has suffered actual damages and is entitled to recover treble damages plus a civil monetary penalty for each instance in which Yogibo made or used a false record or statement to conceal, avoid, or decrease an obligation to pay or transmit money to the United States.

## VII.    PRAYER FOR RELIEF

WHEREFORE, Relator demands and prays for the following relief:

1.     That judgment be entered in favor of the United States for the amount of the United States' damages, trebled as required by law, and such civil penalties as are required by law, together with all such further relief as may be just and proper;

2.     An award to the Relator of a percentage of the proceeds of the action in accordance with 31 U.S.C. § 3730(d);

3.     An award to the Relator of his costs and reasonable attorney's fees for prosecuting this action; and

4.     All other relief as may be required or authorized by law and in the interests of justice.

## VIII.  DEMAND FOR JURY TRIAL

Relator hereby demands a trial by jury.

Dated: January 3, 2022

Respectfully submitted,

DAVID KOHLENBERGER

By his attorneys

/s/ *Gregg Shapiro*
Gregg Shapiro (BBO No. 642069)
Jeffrey Newman (BBO No. 370450)
Newman and Shapiro
1 Story Terrace
Marblehead, MA 01945
Tel: 617-582-3875
gshapiro@newmanshapiro.com